# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

**FILED**

April 06, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap _____
DEPUTY

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| **LARRY GOLDEN,**<br><br>Plaintiff,<br><br>v.<br><br>**APPLE, INC.**<br><br>Defendant. | CIVIL CASE NO: 6: 26 cv 224 -Am<br><br>**JURY TRIAL DEMANDED**<br><br>**Direct Patent Infringement under 35 U.S.C. §§ 271(g) & 271(a); and, Willful Patent Infringement**<br><br>April 3, 2026 |

## COMPLAINT FOR PATENT INFRINGEMENT

## CONTENTS

**Page**

| | |
|---|---|
| 1 | COMPLAINT FOR PATENT INFRINGEMENT |
| 2 | PARTIES |
| 4 | JURISDICTION AND VENUE |
| 6 | PRIOR LITIGATION BETWEEN THE PARTIES |
| 9 | Patent Eligibility and Mutual Exclusivity |
| 11 | STANDARD FOR REVIEW |
| 12 | PLAINTIFF'S DEMAND FOR A JURY TRIAL |
| 13 | Damages |
| 14 | Twelve Federal Judges Validates Plaintiff's Infringement Theory |
| 18 | Twelve Federal Judges Identifies Where on the Inside of the Apple Devices the Detection Capability is Located |
| 20 | Apple's Smartphone Biosensors Submitted to the Courts |
| 20 | Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Apple Devices |
| 21 | U.S. Patent No: 9,096,189 |
| 22 | U.S. Patent No: 9,589,439 |
| 23 | APPLE *"MODIFIED"* THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY |
| 25 | The Cell-All Demonstration Participants and Program Outline |
| 31 | APPLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS [35 U.S.C. § 271(g)] |
| 35 | Apple's Production Process of Plaintiff's Patented Process under § 271(g) |
| 35 | a. Apple's iPhone Design |

| | |
|---|---|
| 38 | b. Apple's Central Processing Unit (CPU) |
| 41 | U.S. Patent No: 10,163,287 |
| 42 | U.S. Patent No: 10,984,619 |
| 44 | c. Apple's iOS Operating System |
| 48 | U.S. Patent No: 9,096,189 |
| 49 | U.S. Patent No: 9,589,439 |
| 50 | d. Apple's *Megapixel* Camera |
| 51 | Apple's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection |
| 55 | Apple's Smartphone Biosensors Submitted to the Courts |
| 56 | e. Apple's iPhone Smartphone GPS Locating and Tracking |
| 58 | f. Apple's iPhone Biometric Authentication |
| 60 | g. Apple's iPhone Disabling Locking Mechanism |
| 62 | h. Apple's iPhone Near-field Communication (NFC) |
| 65 | i. Apple's Watch for External CBRNE-H Detection |
| 67 | Apple's Cell Phone Integration with an "External" CBRNE-H Detection Device |
| 70 | U.S. Patent No: 9,096,189 |
| 71 | U.S. Patent No: 9,589,439 |
| 74 | PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT |
| 74 | Willful Infringement Requires a Finding of Direct Infringement First |
| 74 | Knowledge requirement for Willful Patent Infringement |
| 74 | Under Rule 14(b) |

| 74 | Correspondence |
|----|----------------|
| 74 | Service of Complaint |
| 75 | Plaintiff's Demand for a Jury Trial to Decide Willfulness |
| 77 | COUNT I:<br>TWELVE JUDGES HAVE DECIDED PATENT INFRINGEMENT |
| 80 | COUNT II:<br>INFRINGEMENT OF A PATENTED PROCESS UNDER SECTION 271(g) |
| 82 | COUNT III:<br>U.S. Patent No: 10,163,287 |
| 84 | COUNT IV:<br>U.S. Patent No: 10,984,619 |
| 86 | COUNT V:<br>U.S. Patent No: 9,589,439 |
| 89 | COUNT VI:<br>U.S. Patent No: 9,096,189 |
| 93 | CONCLUSION |
| 95 | PRAYER FOR RELIEF |
| 96 | DEMAND FOR JURY TRIAL |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and 9,096,189 ('189 Patent) for alleged "direct infringement under 35 U.S.C. §§ 271(g) & 271(a)", and/or infringement under the doctrine of equivalents ("patents-in-suit": attached hereto as *Exhibits A - D*) against APPLE, INC. ("Apple" or "Defendant"), and alleges:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of Central Processing Units (CPUs), and Transceivers for both mobile and consumer devices i.e., smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets made for Apple iPhone Smartphones; Apple iPhone Smartphones; Apple Watch Series; Apple Megapixel Cameras made for Apple iPhone Smartphones; and Apple iOS Operating Systems for Apple iPhone Smartphones that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271(g) "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer", and 35 U.S.C. § 271(a), "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent." Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

1

In *Syngenta*, the Federal Circuit further solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Defendant Apple is a California corporation with registered and established places of business in this District at 12545 Riata Vista Circle, Austin, Texas 78727; 12801 Delcour Drive, Austin, Texas 78727; and 3121 Palm Way, Austin, Texas 78758. Apple may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136. Apple is registered to do business in the State of Texas and has been since at least May 16, 1980.

2

On information and belief, Apple regularly conducts and transacts business in the State of Texas, throughout the United States, and within this District, and as set forth below, has committed and continues to commit, tortious acts of infringement within and outside the State of Texas and within this District.

Apple's products are offered for sale through numerous mobile carriers in this judicial District, including, but not limited to Verizon stores at 2812 W Loop 340 Suite# H-12, Waco, TX 76711; 1820 S Valley Mills Dr, Waco, TX 7671; and 3590 Greenlawn Blvd Suite 103, Round Rock, TX 78664; T-Mobile Stores at 2448 W Loop 340 Suite 24a, Waco, TX 76711 and 208 Hewitt Dr Suite #200, Waco, TX 76712; and AT&T Stores at 4330 W Waco Dr, Waco, TX 76710; 2320 W Loop 340 #100A, Waco, TX 76711; and 1515 Hewitt Dr Ste A, Waco, TX 76712 (collectively, "Waco and Austin Carrier Stores"). On information and belief, Apple products relevant to the allegations in this Complaint have been sold and used at the Waco and Austin Carrier Stores, and are offered for sale at the Waco and Austin Carrier Stores.

Apple also owns and operates Apple Stores in multiple locations in this District including stores at 3121 Palm Way, Austin, TX 78758; 2901 S. Capital of Texas Hwy, Austin, TX 78746; 15900 La Cantera Parkway, San Antonio, TX 78256; 7400 San Pedro Avenue, San Antonio, TX 78216; and 8401 Gateway Boulevard West, El Paso, TX 79925 where accused Apple products relevant to the allegations in this Complaint have been sold and used, and offered for sale.

Apple also operates a growing $1 billion campus in this District at W. Parmer Ln. & Dallas Dr., Austin, TX 78729. On information and belief, and according to publicly available reports, the Apple Austin campus will initially employ over 5000 people with the ability to employ up to 15,000 people. See https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/ (last visited February 6, 2024).

3

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

This Court has personal jurisdiction over Apple by virtue of its systematic and continuous contacts with this jurisdiction, as alleged herein, as well as because the injury to Plaintiff occurred in the State of Texas and the claim for relief possessed by Plaintiff against Apple for that injury arose in the State of Texas. On information and belief, Apple has purposely availed itself of the privileges of conducting business within the State of Texas, such business including but not limited to: (i) at least a portion of the infringements alleged herein; (ii) purposefully and voluntarily placing one or more infringing products or services

4

into the stream of commerce with the expectation that they will be purchased by consumers in this forum; or (iii) regularly transacting or soliciting business, engaging in other persistent courses of conduct, or deriving or attempting to derive substantial revenue and financial benefits from goods and services provided to individuals residing in the State of Texas and in this District. Thus, Apple is subject to this Court's specific and general personal jurisdiction under due process and the Texas Long Arm Statute.

Personal jurisdiction also exists specifically over Apple because Apple, directly or through subsidiaries or intermediaries (including customers, distributors, retailers, and others), subsidiaries, alter egos, and/or agents – ships, distributes, offers for sale, licenses, sells, imports, advertises, or markets in the State of Texas and in this District, one or more products or services that infringe the Patents-in-Suit.

Apple has purposefully and voluntarily placed one or more of its infringing products and/or services, as described, into the stream of commerce with the awareness and/or intent that these products and/or services will be purchased or used by consumers in this District. Apple has knowingly and purposefully shipped infringing products into and within this District through an established distribution channel. These infringing products have been and continue to be purchased and used by consumers in this District.

Plaintiff's claim for relief for patent infringement arises directly from the activities of Apple in this District.

On information and belief, Apple, directly and/or through its customers has transacted business in this District and has committed acts of patent infringement in this District. By virtue of its offices in this District, Apple has a regular and established place of business in this District. Thus, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

## PRIOR LITIGATION BETWEEN THE PARTIES

In prior litigation between the parties, Plaintiff have always been denied his Seventh Amendment right to a trial by jury.

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, then according to the rules of the common law." [U.S. CONS'T. 7th Amend.]

Patent infringement claims are issues-of-fact to be tried by a jury under the Seventh Amendment. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare. Prior litigation:

*Golden v. Apple, Inc.* SCDC Case No. 19-2557 filed 01/27/2020: "Dismissed as being duplicative. Plaintiff further objects to the dismissal of his case because he claims that he is barred from bringing a patent infringement case against a private party [contractor who is performing work for the Government with the authori-zation or consent of the Government] and the Government [under 28 U.S.C. § 1498] in the same court. This objection has no basis in the law and is overruled":

"To the extent Plaintiff argues that the Defendants in the present action are immune from suit in the Court of Federal Claims, has not pointed to, and the Court has been unable to find, any authority to support a theory that these Defendants would be treated differently in this Court."

"In light of the foregoing, this action is DISMISSED without prejudice and without issuance of service of process. The Court finds Plaintiff should not be given a second opportunity to amend his complaint in the instant matter because any amendment would be futile in light of the pending duplicative litigation."

*Golden v. Apple, Inc.* et al CAFC Case No. 22-1229 Dkt. 16 filed 09/08/2022: 09/08/2022: "In the Apple case, the district court dismissed the complaint as frivolous without the issuance of service of process but declined to dismiss with prejudice."

*Golden v. Apple, Inc.* NDC Case No. 22-4152 Dkt. 29 filed 10/20/2022: "The motion to dismiss is granted. The claims asserted in the complaint are frivolous."

*Golden v. Apple, Inc.* CAFC Case No. 23-1161 Dkt. 25 filed 05/12/2023: "The district court properly dismissed the complaint as frivolous" ... "dismissing antitrust claims as frivolous" ... "dismissing patent infringement claims as frivolous" ... "affirming dismissal of patent infringement claims as frivolous" ...

The Courts failed to identify any of the following six factors for determining the frivolousness of Plaintiff's complaint, but yet, because the Court ruled Plaintiff's complaint as frivolous, the Court's continued to unjustly dismiss Plaintiff's alleged infringement claims without leave to amend.

*Lack of Legal Basis:* The complaint does not cite any valid patent claims or legal grounds for infringement.

*Absence of Evidence:* There is no supporting evidence to substantiate the claims of infringement.

7

*Unclear Claims:* The patent claims are vague or poorly defined, making it difficult to determine infringement.

*Prior Art:* The accused product or method is already covered by prior art, negating the patent's validity.

*Failure to Notify:* The complainant did not adequately inform the alleged infringer of the patent rights before filing.

*Bad Faith:* The complaint is filed with the intent to harass or extort rather than to protect legitimate patent rights.

Effectively, Apple would have had to convince a judge & jury that Plaintiff's patent infringement contentions were on-their-face frivolous; that no one who took a look at the claims & products could reasonably believe that infringement was legitimate. A judge ruling from the bench without a jury, would have had to be convinced that there were no fact issues of patent infringement, or that there were no patent infringement claims, that are issues-of-facts to be tried by a jury. "Patent infringement claims are issues-of-facts to be tried by a jury [7th Amend.]

Dismissals under res judicata are merit decisions; and a dismissal on the merits is a requirement for dismissing a case under the doctrines of res judicata and Kessler. Dismissals for frivolousness are not merit decisions; which means Plaintiff cannot be barred from making a claim of patent infringement against Apple for allegedly infringing Plaintiff's patented inventions. To understand the difference between *res judicata* and frivolousness, consider these key points:

*Res judicata* applies to cases that have been decided on their merits, preventing re-litigation. Frivolousness refers to claims that lack legal merit and are dismissed without a substantive decision.

*Res judicata* requires a final judgment from a competent court to be effective. Frivolous claims can be dismissed at any stage of litigation, often before a trial.

*Res judicata* promotes judicial efficiency by avoiding repetitive litigation on the same issue. Frivolousness serves to protect the court system from baseless claims that waste resources.

8

**Patent Eligibility and Mutual Exclusivity**

Plaintiff's patents and patent claims asserted in this complaint that describes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device as a "mobile, consumer, or cellular device that is integrated with, or interconnected to, a CBRNE-H detection capability, have undergone rigorous and extensive examinations and re-examinations at the U.S. Patent and Trademark Office (USPTO) with challenges to Plaintiff's patents and patent claims validity: "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. Anyone challenging the patents validity, must do so on the heightened 'clear and convincing evidence' standard" [35 U.S.C. § 282(a)].

Time after time, over the years, and over several of Plaintiff's patents; when the phase "in, on, upon, or adjacent the monitoring equipment", was used to describe the detection capability is placed either inside or outside the monitoring device, the USPTO have always allowed the phase.

Claims are one sentence descriptions, included in a patent, that describe what aspects of the invention are protected by law. There are independent claims and dependent claims. Dependent claims add details to independent claims and are consequently "narrower" than their parent independent claim. The product manufactured by or for the government need only infringe one claim, independent or dependent, to "infringe the entire patent." See *Johns Hopkins University v. CellPro, Inc.*, 152 F3d 1342 (Fed Cir 1998).

In a precedential decision, the U.S. Court of Appeals for the Federal Circuit in *Vascular Solutions*, along with related Teleflex companies (collectively with

Vascular Solutions, "Teleflex") *v. Medtronic*, Inc. defined the concept of "*mutual exclusivity*" in patent claims:

> The Federal Circuit held that the district court erred when it determined the asserted claims were "*mutually exclusive*" and indefinite. The Federal Circuit rejected the notion that claims in a patent cannot vary in how they describe the disclosed subject matter or that independent claims must be totally consistent with other independent claims.

The Federal Circuit stated: "The district court's conclusion, in effect, means that (1) claims in a patent cannot vary in the way they claim the disclosed subject matter, and (2) independent claims must be totally consistent with other independent claims. Claiming is not restricted in this way." It emphasized that the art of patent claiming often involves drafting claims in various ways to encompass different aspects of the disclosed subject matter, as long as each claim informs those skilled in the art about the scope of the invention with reasonable certainty.

The Federal Circuit instructed the district court to "conduct claim construction on a claim-by-claim basis with the understanding that, at the claim construction stage, the claims are not necessarily '*mutually exclusive*' since each independent claim is a different ordered combination of limitations."

Therefore, when a case is dismissed for preclusion or *Kessler* simply because the same patents was asserted in a previous case, and the individual claims were never examined for infringement, the dismissal is improper "since each independent claim is a different ordered combination of limitations".

In Plaintiff's prior litigation the Courts created a loophole for invalidating Plaintiff's patents without meeting the higher "clear and convincing" evidence standard; without submitting invalidity contentions; without a Markman hearing or claim construction. No law supports this type of loophole creation.

10

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused devices [] required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Apple devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Apple CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Apple CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff maintains he has additional factual allegations to support his claims in the form claim charts readily available by order of this Court.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Apple accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

## PLAINTIFF's DEMAND FOR A JURY TRIAL

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged throughout this complaint "enough facts to state a claim to relief that is plausible on its face" *Twombly*, 550 U.S. at 570, for Apple's alleged infringement of Plaintiff's patented process; whereby, infringement under § 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a).

Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully" *Iqbal*, 556 U.S. at 678. The Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged." The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the

infringing process was used and the patentee has been unable to make a definitive determination on its own. [See 35 U.S.C. § 295].

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment [U.S. CONS'T. 7th Amend]. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare.

**Damages**

Plaintiff is demanding damages for Apple's alleged direct infringement under 35 U.S.C. § 271(g) and 35 U.S.C. § 271(a); direct infringement under the doctrine of equivalents, and willful infringement, for the unauthorized act of making, using, selling, or importing inventions (i.e., Apple's central processing unit, operating system, smartphone, camera, and smartwatch) for which patents has been issued with the presumption of validity (35 U.S.C. § 282), per the Patent Act.

Damages are a question of fact; thus, a jury will decide damages. The Western District of Texas (WDT) court judge will decide damages if this case is not before a jury. Plaintiff is demanding a jury trial to determine Apple's alleged patent infringement damages; and, to recover damages adequate to compensate for the alleged patent infringement. A jury can determine damages, but the presiding judge in this Western District of Texas (WDT) court case *Golden v. Apple* will determine damages if the case is not heard by a jury.

Plaintiff's alleged damages must be sufficient to compensate for the alleged patent infringement and at least amount to a reasonable royalty for Apple's alleged use of Plaintiff's patented inventions. Plaintiff allege more consumers start buying Apple's alleged infringing products (i.e., Apple's central processing unit, operating system, smartphone, camera, or smartwatch) because Plaintiff's invention has

13

improved them. Therefore, Plaintiff is entitled to those profits that should have belonged to Plaintiff.

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing item (i.e., Apple's central processing unit, operating system, smartphone, camera, or smartwatch) and then multiply that value by the number of items that infringed.

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016). Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Plaintiff believes Apple's conduct to be "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

**Twelve Federal Judges Validates Plaintiff's Infringement Theory**

Upon information and belief, there's no need for this Court to continue litigating claims made against Apple for the alleged infringement of Plaintiff's patents because twelve Federal Judges (three in the district courts; nine at the federal circuit) have determined infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

14

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart.

15

Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's

complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68

17

Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

**Twelve Federal Judges Identifies Where on the Inside of the Apple Devices the Detection Capability is Located**

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises ***"through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126.": [1]

> In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126."

Samsung admits in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048; and Google admits in the Northern District of California Court in *Golden v Google* Case No. 22-5246 that Mr. Golden's complaints alleged ***"nine standard sensors which can be used as biosensors"***.

Samsung & Google also admits the ***"nine standard sensors which can be used as biosensors"***, is found within each of Samsung's and Google's accused instrumentalities. Samsung and Google further admit, it is making, offering for sell, selling, and purportedly importing the Samsung and Google smartphones that include the ***"nine standard sensors which can be used as biosensors"*** and performs the accused detector/sensor functionality.

---

[1] In *Golden v. Apple, Inc.* NDC Case No. 22-4152 Dkt. 29 filed 10/20/2022, Plaintiff included the same nine standard biosensors but the complaint was dismissed as "frivolous". On appeal, the Circuit in *Golden v. Apple, Inc.* CAFC Case No. 23-1161 Dkt. 25 filed 05/12/2023 "affirming dismissal of patent infringement claims as frivolous".

---

**Apple's Smartphone Biosensors Submitted to the Courts:**

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

If the Circuit had read Plaintiff's pleadings, the Circuit would have realized the Northern District of California court, and the U.S. Court of Appeals for the Federal Circuit; both determined the *"modified"* cell phones of Samsung and Google that mirrors the *"modified"* cell phones of Apple; include the same ***"nine standard sensors which can be used as biosensors"***.

**Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Apple Devices**

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and, an Apple *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Apple watch for

20

CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.
"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to [IPR claim construction for the term "built-in, embedded"], a CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device …;

21

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device ...;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone at least one of a chemical sensor, a biological sensor ...

Plaintiff alleges Apple *"modified"* the cell phone to include an internal camera biosensor and an external—to the Apple iPhone smartphone—Apple Watch for chem/bio detection.

Claim 23 of Plaintiff's '439 patent claims both the internal ("at least one of a chemical sensor, a biological sensor ... being disposed within") and an external ("the cell phone detection device ... capable of being [] adjacent the cell phone"); detection capability. Apple's *"modified"* cell phones are designed to perform these detection functions.

22

## APPLE "*MODIFIED*" THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY

Apple must admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Apple must also admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device is infringed when a mobile, consumer, or cellular device is "modified by a third party" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

Apple's argument is: it is not Apple itself who is the party responsible for "*modifying*" the cell phone to function as a CBRNE-H detection device. Apple is accused of "making" the alleged infringing products.

The United States impliedly authorized and consented to Apple "*modifying*" the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Apple was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

> "… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system…***" [DHS S&T BAA07-10 Cell-All Ubiquitous Biological and Chemical Sensing]

23

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) ... "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" ... "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."

Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect



**The Cell-All Demonstration Participants and Program Outline**

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Introduction to "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department: Host location for the demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative: *Phase II* of the *Cell-All* initiative advances the mobile devices (i.e., cell phones, smartphones, or CMDC devices) from devices that include CBRNE sensors "embedded" within the devices (*Phase I*), to mobile devices that include CBRNE detectors and/or sensors remote the mobile devices (i.e., cell phones, smartphones, or CMDC devices). (*Phase II*)

- Dr. Jing Lee, Principal Investigator, NASA Ames Research Center: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a Chem/Bio medical health detection capability". [NASA acquired a license from the medical industry]

- Debra Deininger, Synkera Technologies, Inc.: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected

to, a CBRNE detection capability". Previous work, through a Small Business Innovation Research (SBIR) project, for the miniaturization of sensors.

- Doug Hoffman, Program Manager, Qualcomm: Qualcomm was awarded the *Cell-All* contract, and designated the prime contractor's position responsible for delivering the improved upon cell phones; that include improved upon CPUs; wireless modems; operating systems; and miniaturized sensors for CBRNE detection.

- Chris Needs, Product & Control Manager, NC4: Middleman service for the for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative responsible for monitoring, identifying location, notifying, alerting, and transmitting data.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Setting the scenario for a live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department and Chris Needs, Product & Control Manager, NC4; narrates the live demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T interviews Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; post the live demonstration.

- Panel assembled for Q&A: Panel participants are: Chief Corey Rose [Location Host]; Los Angeles Fire Department; Stephen Dennis, Technical

26

Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; Dr. Jing Lee, Principal Investigator, NASA Ames Research Center; Debra Deininger, Synkera Technologies, Inc.; Doug Hoffman, Program Manager, Qualcomm; and, Chris Needs, Product & Control Manager, NC4.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Closing remarks and thanks to everyone involved in making the live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability" a success.

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

The DHS S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, *Apple*, and Samsung. The written agreements, are designed to bring together a

private company and a government agency for a specific project, often to accelerate the commercialization of technology developed for government purposes.

Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, three teams: Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology perfected their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station, and technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, a three-year-old San Diego-based startup, is developing advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of UC San Diego Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" developed by Sailor's group, which are composed of nanoparticles that change color in the presence of certain molecules. <u>Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.</u> Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds."

28

"Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and *Samsung*—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010). Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

In *Golden v. United States* CFC Case No. 13-307C, Apple was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court notified Apple to make an appearance to protect its interest in the subject matter of the suit. Apple failed to appear, which means a final decision of a dispute between the private parties of Golden v. Apple in the United States Court of Federal Claims, never happened.

In resolving a petition for mandamus, the Federal Circuit held in *In re UUSI, LLC*, that a third party's potential obligation to indemnify the government for any patent infringement liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests." 549

F. App'x 964, 968 (Fed. Cir. 2013), aff'g *UUSI, LLC v. United States*, 110 Fed. Cl. 604 (2013).

While Apple need not have participated in the § 1498 litigation, Apple's failure to appear in response to the notice under Rule 14(b) acts as a waiver of any later argument that Apple should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

The notice issued by the United States Court of Federal Claims in *Golden v. United States* CFC Case No. 13-307C satisfies the knowledge requirement for a claim of willful infringement.

Apple was given a second chance to protect its interest in *Golden v. Apple, Inc.* NDC Case No. 22-4152; in the subject matter of a lawsuit originally brought against the United States in *Golden v. US* CFC Case No. 13-307C; by claiming the affirmative defense that Apple was authorized, or received the Government's consent, to manufacture for the Government, under 28 U.S.C. § 1498(a), a "modified, or new, improved upon, or useful cell phone; but failed in both Courts to defend against Plaintiff's claim that Apple allegedly infringes Plaintiff's CMDC device (a "modified, or new, improved upon, or useful cell phone). Therefore, Apple should not be given another chance.

30

**APPLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS [35 U.S.C. § 271(g)]**

In *Syngenta Crop Protection LLC v. Willowood LLC, et al.*, the US Court of Appeals for the Federal Circuit held in a case of first impression that infringement liability under 35 U.S.C. § 271(g) does not require a single entity to perform all steps of the patented process. *See* No. 2018-1614 (Fed. Cir. Dec. 18, 2019) (*"Syngenta"*). The Federal Circuit's decision strengthens process claims' usefulness against accused infringers (i.e. Apple) who manufacture a patented product [such as the Apple iPhone smartphone] abroad and import it into the US. Section 271(a) identifies acts that constitute direct infringement, providing that:

> "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent, therefore, infringes the patent."

In addition, §§ 271(b) and 271(c) define indirect infringement, creating vicarious liability for those who induce or contribute to acts of direct infringement. Although § 271(a) provided strong protection for patent owners against purely domestic infringement, the patent laws did not protect against infringing acts occurring outside of the US. (See § 271(a) ("within the United States").

This gap in protection was highlighted in the US Supreme Court's *Deepsouth Packing Co. v. Laitram Corp.* decision, which held that exporting components of a patented product for assembly abroad did not constitute direct infringement, reasoning that a patented system is made only after final assembly. *See* 406 U.S. 518, 529- 32 (1972). Since final assembly was performed abroad, there could be no infringement under § 271(a).

31

As world trade and globalization continued to expand in the 1980s and 1990s, it became clear that patent owners in the US were more vulnerable than ever to infringers abroad. In response, US Congress broadened the scope of infringing activities through legislative amendments to the Patent Act, adding §§ 271(f) in 1984 and 271(g) in 1998. *See Kastenmier*, "Section-By-Section Analysis of H.R. 6286, Patent Law Amendments Act of 1984," Congressional Record of October 1, 1984 at H10525 to H10529. Section 271(g) provides that:

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer."

Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

The district court rejected Syngenta's § 271(g) claims, finding that § 271(g) requires that all steps of the patented process be performed by a single entity. This requirement limits direct infringement liability only to circumstances "where all steps of a claimed method are performed by or attributable to a single entity." The district court believed that the single-entity requirement present for method claims under §§ 271(a) and (b) under cases such as *Limelight* and *BMC* carried over to § 271(g). *See Akamai Techs. v., Limelight Networks, Inc.*, 572 U.S. 915, 921-22 (2014) ("Limelight"); *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007)

The Federal Circuit reversed. First, the court interpreted § 271(g) as written, explaining that "nothing in this statutory language suggests that liability arises from practicing the patented process abroad. Rather, the focus is only on acts with respect

to products resulting from the patented process." *Syngenta* at *23. Accordingly, whether that process is practiced by a single entity is immaterial to the analysis.

Second, the court held that comparison to the language of other parts of § 271 supported its conclusion. The court rejected *Willowood's* extension argument based on § 271(a) and the *Limelight* decision because, as noted above, infringement under § 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a) to method claims. The court also applied the same logic to distinguish §271(f) from § 271(g), stating that if Congress had wanted to require a single-entity requirement under 271(g) they "knew how to do so" given the single-entity requirement under 271(a) and 271(f).

Third, the Federal Circuit noted that the legislative history demonstrates that Congress did not enact § 271(g) to provide for identical rights to those enjoyed by patentees under § 271(a) with respect to process patents. Rather, Congress made clear that § 271(g) "is prompted by the use of patented processes in other countries followed by the importation of the resulting products into this country" and simply "extend[s] protection to the products" made by such a process.

Therefore, in *Syngenta*, the Federal Circuit further solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented

33

process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of <u>Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product</u> if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive determination on its own. See 35 U.S.C. § 295. The court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process." [*Syngenta*]

In *Bayer AG v. Housey Pharmaceuticals, Inc.*, the defining case for § 271(g) jurisprudence, the Federal Circuit held that to have a claim under § 271(g), an imported product must be physical and tangible *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). The Federal Circuit in *Bayer* required that an imported product made by a process patented in the U.S. must be physical and tangible to be eligible for an infringement claim under § 271(g). The Federal Circuit added another requirement in *NTP* that the process patent must describe a production process, not a distribution or transmission process.

The subsequent decisions by the district courts of California in *CNET* and *Ormco* remedied the Bayer problem by holding that digital information stored in computer readable media is a physical product covered under § 271(g), thereby circumventing Bayer's physical and tangible requirement and increasing the extraterritorial protection of process claim.

However, they still left uncertainty regarding NTP's production claim requirement. A district court's decision in *Yangaroo* established that the drafters of process claims must be explicit about the intention to create a physical article by describing the recording process.

34

**Apple's Production Process of Plaintiff's Patented Process under § 271(g)**

a. **Apple's iPhone Design.** Apple's first patent for the iPhone was a design patent. A patent that focuses on how the iPhone is shaped and its size, rather than its functionality. Both the iPhone and the iPhone case, or sleeve, is covered by Plaintiff's patented process:



Figure 1

The second-generation Apple "SatSleeve" iPhone case configuration will connect to your iPhone using Wi-Fi rather than Bluetooth.

35

| Apple's 1st Patent for the electronic device (i.e., smartphone) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887) | Golden's Patent for the Detector Case (i.e., CMDC device) ornamental design: USPTO Disclosure Document filed Nov. 17, 2004; (*Doc. No. 565732)* First application filing date is April 5, 2006 (App. # 11/397,118) |
|---|---|
| Electronic Device: "The device (i.e. electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html | CMDC Device: The detector case [CMDC device] includes a power source (battery or electrical) … A cpu 40 is mounted within the [CMDC device] 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case [CMDC device] includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 4 is a rear view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |

36

| | |
|---|---|
| FIG. 8 is a right-side view for the electronic device | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case [CMDC device]; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e., smartphone) and the cell phone detector case |
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. Examples of an electronic device are a computer, a portable or **hand-held device, a personal digital assistant**, a communication device (e.g., cellular phone), a novelty item, toy, and/or the like. | FIG. 15 is a representative schematic view of... a monitoring PC or computer terminal. It is another objective of the present invention to provide... products grouped together by common features in several product groupings such as design similarity... product grouping strategy has been developed wherein products... having the same or similar design... [i]n addition to grouping products together by features, designs and materials... **FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case** |

| | |
|---|---|
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. *Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive* | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

Apple includes in its production process a case for the iPhone itself that is produced specifically for the iPhone brand or model, and/or a "sleeve" that is specifically for the design of the iPhone brand or model, before importation.

37

**b. Apple's Central Processing Unit (CPU).** Apple's modification of the cell phone "production process" begins with what is recognized in the industry as the "brains" of the cell phone. The central processing unit (CPU), or combination thereof, is considered the "brains" of the "*modified*" cell phone device. Apple's *modified* cell phone CPUs carry out the operational and functional instructions of the device's computer program. The Apple *modified* cell phone's CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the Apple *modified* cell phone's CPU and other components, such as memory and input/output devices.

- Apple's *"modified"* cell phone central processing unit (CPU): is considered the "brains" of the mobile device (i.e., smartphone).

- Apple's *"modified"* cell phone central processing unit (CPU): executes instructions from applications and the operating system, performing calculations and data manipulation. The mobile device can run multiple applications simultaneously without significant performance degradation.

- Apple's *"modified"* cell phone central processing unit (CPU): often feature multiple cores, enabling parallel processing and improved multitasking capabilities.

- Apple's *"modified"* cell phone central processing unit (CPU): directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices. The Mobile CPU manages data storage and retrieval in RAM, ensuring efficient access to information needed by applications: are designed to optimize power consumption, balancing performance with battery life to enhance user experience in portable devices.

38

- Apple's *"modified"* cell phone central processing unit (CPU): architecture refers to the design and organization of the core components of a CPU. It encompasses the instruction set architecture (ISA), microarchitecture, and the physical implementation of the CPU. The ISA defines the set of instructions that the CPU can execute, while the microarchitecture outlines how these instructions are processed. The physical implementation involves the actual manufacturing process and materials used to create the CPU.

Plaintiff is providing below six years of Apple's Chipset/CPU history to illustrate how Apple has continued to produce and manufacture, as a standard component of the Apple iPhone Smartphones, Plaintiff's patented process for his patented central processing units for mobile devices.

*Apple A14 Bionic:* The Apple A14 Bionic is a 64-bit ARM-based SoC that first appeared in the fourth-generation iPad Air and iPhone 12, released on October 23, 2020. It is the first commercially available 5nm chipset and contains 11.8 billion transistors and a 16-core Neural Engine. It includes the Samsung LPDDR4X DRAM, a 6-core CPU, and a 4-core GPU with real-time machine learning capabilities. It was later used in the tenth-generation iPad, released on October 26, 2022.

*Apple A15 Bionic:* The Apple A15 Bionic is a 64-bit ARM-based SoC that first appeared in the iPhone 13, unveiled on September 14, 2021. The A15 is built on a 5-nanometer manufacturing process with 15 billion transistors. It has 2 high-performance processing cores, 4 high-efficiency cores, a new 5-core graphics for iPhone 13 Pro series (4-core for iPhone 13 and 13 mini) processing unit, and a new 16-core Neural Engine capable of 15.8 trillion operations per second. It is also used

39

in the third-generation iPhone SE, iPhone 14, iPhone 14 Plus, sixth-generation iPad Mini and third generation Apple TV 4K.

*Apple A16 Bionic:* The Apple A16 Bionic is a 64-bit ARM-based SoC that first appeared in the iPhone 14 Pro, unveiled on September 7, 2022. The A16 has 16 billion transistors and is built on TSMC's N4P fabrication process, being touted by Apple as the first 4 nm processor in a smartphone. However, N4 is an enhanced version of N5 technology, a de facto fourth-generation 5 nm manufacturing process. The chip has 2 high-performance processing cores, 4 high-efficiency cores and 5-core graphics. Memory is upgraded to LPDDR5 for 50% higher bandwidth and a 7% faster 16-core Neural Engine capable of 17 trillion operations per second. It was later used in the iPhone 15 and iPhone 15 Plus, as well as the iPad 11-inch, with a 5-core CPU and 4-core GPU.

*Apple A17 Pro:* The Apple A17 Pro is a 64-bit ARM-based SoC that first appeared in the iPhone 15 Pro, unveiled on September 12, 2023. It is Apple's first 3 nm SoC. The chip has 2 high-performance processing cores, 4 high-efficiency cores, a 6-core GPU, and a 16-core Neural Engine capable of 35 trillion operations per second. The GPU was described as their biggest redesign in the history of Apple GPUs, adding hardware accelerated ray tracing and mesh shading support. It is also used in the iPad Mini, with a 5-core GPU.

*Apple A18 and Apple A18 Pro:* The Apple A18 and Apple A18 Pro are 64-bit ARM-based SoCs designed by Apple that first appeared in the iPhone 16 and iPhone 16 Pro respectively, unveiled on September 9, 2024. Both SoCs are built on TSMC's N3E process and have 2 high-performance cores and 4 high-efficiency cores. The A18 has 5-core graphics (4-core for iPhone 16e), while the A18 Pro has 6-core graphics. The A18 and A18 Pro use LPDDR5X for 17% higher memory bandwidth, and the 16-core Neural Engine has the same quoted power as the A17 Pro. The A18 Pro is also used in the MacBook Neo, with a 5-core GPU.

40

*Apple A19 and Apple A19 Pro:* The Apple A19 and Apple A19 Pro are 64-bit ARM-based SoCs designed by Apple that first appeared in the iPhone 17, iPhone Air, and iPhone 17 Pro respectively, unveiled on September 9, 2025. Both SoCs are built on TSMC's N3P process and have 2 high-performance cores and 4 high-efficiency cores. The A19 has 5-core graphics (4-core for iPhone 17e), while the A19 Pro has 6-core graphics (5-core for iPhone Air). The A19 and A19 Pro are also used in the Studio Display (2026) and Studio Display XDR.

Independent claims 4, 5, & 6 of Plaintiff's '287 patent; and independent claims 1, & 11 of Plaintiff's '619 patent; and dependent claims 5, 6, 7, 15, 16, & 17 of Plaintiff's '619 patent, illustrates Plaintiff's patented process for his patented central processing unit:

**U.S. Patent No: 10,163,287**

4. A communication device comprising:

at least one central processing unit (CPU);

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**U.S. Patent No: 10,984,619**

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

15. The central processing unit (CPU) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

**c. Apple's iOS Operating System.** The Apple *"modified"* cell phone operating system manages hardware such as the Apple *"modified"* cell phone central processing unit (CPU). It provides connections such as: cellular, Wi-Fi, Bluetooth, NFC and communication with other devices.

Wi-Fi: enables connection to local networks and internet. Cellular: supports mobile data through 3G, 4G, and 5G networks. Bluetooth: facilitates short-range communication with other devices. NFC: allows for contactless transactions and data exchange.

Upon information, the Apple *"modified"* cell phone operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful "transceiver". In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that a patentee may invoke this doctrine to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result. This is often referred to as the *Graver Tank* "triple identity" test for equivalence.

To better understand the equivalency of the production process, features, and functions of the Apple iOS operating system to the Plaintiff's patented transceiver invention, Plaintiff have provided relative bullet points for the Apple iOS operating system and Plaintiff's patented transceiver, below:

*Apple iOS operating system*

- Apple's A-series processors are custom-designed CPUs that optimize performance and efficiency.
- Optimized Architecture: iOS is designed to work seamlessly with Apple's custom ARM-based CPUs, maximizing performance and efficiency.
- Resource Management: The iOS efficiently manages CPU resources, allocating tasks to ensure smooth multitasking and responsiveness.
- Power Efficiency: iOS incorporates power-saving features that help extend battery life while maintaining CPU performance.
- Hardware Integration: Close integration between iOS and hardware allows for optimized performance in graphics, processing, and machine learning tasks.
- Security Features: iOS utilizes hardware-based security features, such as the Secure Enclave, to protect sensitive data processed by the CPU.
- Regular Updates: Apple frequently updates iOS to enhance compatibility and performance with new CPU architectures and features.
- Apple's approach to CPU scheduling plays a critical role in delivering the seamless, high-performance experience that users expect across Apple iOS operating system.
- iOS software is tightly integrated with the CPU architecture to ensure optimal performance and energy efficiency. The CPU architecture in iPhones has significantly evolved over the years.
- iOS is a closed operating system exclusively running on Apple devices with ARM-based processors (CPUs).
- A key feature of the Apple iOS operating system is the Assisted GPS. The iPhone utilizes an inbuilt Assisted GPS chip for location detection. This provides a quick and accurate approximation of the user's location based on satellite information.

45

*Plaintiff's patented transceiver invention [specifications]*

- 46 is used as a stand-alone scanner … 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40…

- wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver…

- FIG. 19 is a perspective view of [] the present invention illustrating the use of a GPS satellite in conjunction with the [] monitoring equipment to relay commands and signals to the cpu or transceiver…

- a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones…

- A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204…

- GPS satellite 204 locates and communicates [] signal 212 with the CPU or transceiver…

- The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU [] to initiate or execute any commands…

- GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202

iOS is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. See 35 U.S.C. § 271(g). The Apple iOS operating system is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

iOS stands for iPhone Operating System. Apple created this proprietary software specifically to run its line of mobile smartphones. iOS is Apple's mobile OS designed to power iPhones, iPads, and iPod Touch devices. It is an operating system that manages hardware and software functions, enabling seamless interaction between applications, system components, and connected services.

A mobile operating system acts as the vital bridge connecting physical hardware to digital software. It tells the processor to open an app, commands the battery to allocate power. Without this middleman, your phone would be completely unable to process your requests or run the applications you rely on daily. The company handles all development and updates internally.

An iPhone rarely works in isolation. iOS connects directly to a massive digital marketplace and a broader network of connected devices. This tight integration ensures that managing software, syncing files, and connecting accessories happens with minimal friction.

iOS stands as a highly secure, exceptionally user-friendly operating system that serves as the absolute foundation of the iPhone. It provides a heavily protected environment where millions of people can communicate, work, and manage their daily tasks with confidence. Biometric security measures, such as Face ID and Touch ID, ensure that only you can unlock your device or authorize payments.

iOS is famously designed to communicate flawlessly with other Apple hardware. If you own a Mac, an Apple Watch, or a pair of AirPods, the integration is practically automatic.

Beyond simply operating a smartphone, this software connects with watches, tablets, and computers, iOS creates a unified experience that keeps users connected and completely immersed in the Apple ecosystem. The core features of iOS are a gesture-based user interface that allows connectivity across iPhone, iPad, Mac, and Apple Watch.

To determine whether a substitute element is the substantial equivalent of an element in the patented invention, it is necessary to analyze the role played by each element in the context of the specific patent claim.

Independent claim 7 of Plaintiff's '189 patent and independent claim 19 illustrates how the operating system (i.e., Plaintiff's patented "transceiver") performs or functions within Plaintiff's patented process.

**U.S. Patent No: 9,096,189**

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

48

**U.S. Patent No: 9,589,439**

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi sensor detection device, or transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, or long-range radio frequency, and short-range radio frequency (RF).

The doctrine of equivalents is a means by which a holder of a patent may raise a claim of infringement even though each and every element of the patented invention is not identically present in the allegedly infringing product. The purpose of the doctrine is to prevent an infringer from stealing the benefit of a patented invention by changing only minor or insubstantial details of the claimed invention while retaining the same functionality.

**d. Apple's *Megapixel* Camera.** In *Syngenta*, the Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity (Apple) before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity (Apple), or one-party exercising direction and control over other entities (i.e., Rhevision), was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

The Apple Megapixel camera is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple megapixel camera is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

*Phase I* specifications of the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007]; requires Apple modify the cell phone with "internal" sensors for CBRNE-H detection.

Apple entered into an agreement with the Government (DHS S&T) to integrate the CBRNE-H internal sensors that was being developed by at least the

50

awarded third-party contractors of the *Cell-All* initiative: Rhevision; SeaCoast; NASA; Qualcomm; and Synkera.

Upon information and belief, Apple "*modified*" the cell phone with camera(s) equipped to detect for CBRNE-H. Under the *Cell-All* initiative Rhevision developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

"Rhevision Technology, [] develop[ed] advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of [] Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" [], which are composed of nanoparticles that change color in the presence of certain molecules. ***Rhevision [] integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.*** Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor; compare the results with known toxic compounds."

| *PHASE I* – INTERNAL SENSOR OF THE *CELL-ALL* INITIATIVE | |
|---|---|
| **Apple's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection** | |
| *"Phase I"- Internal Sensor*<br><br>Apple's "*modified*" cell phone with its "*modified*" cell phone camera | Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds. |

51

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | Apple's *"modified"* cell phone devices, have built-in QR scanners in the camera app, so you don't need a separate app. Simply point the camera at the code, and it should work instantly. Apple's *"modified"* cell phone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency. One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information. Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training. QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols. |
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | Apple's *"modified"* cell phone-based biosensors are rapidly redefining how the world conducts medical diagnostics, enable precise, real-time detection of biological and chemical agents. Apple's *"modified"* cell phone devices have a platform in biosensing ecosystems: facilitating the proliferation of biosensors that capitalize on Apple's *"modified"* cell phones' camera optics, wireless connectivity, and computational power. Optical biosensors utilize the Apple *"modified"* cell phone cameras and LED flashes to detect visual changes in assays, particularly in colorimetric or fluorescent formats. Images taken by a conventional Apple cell phone camera can be *modified* using deep learning algorithms to improve their spatial resolution, signal-to-noise ratio, and color response. |
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | Apple's *"modified"* cell phone cameras megapixel camera, smaller than the head of a pencil eraser captures the image from the array of nanopores in the silicon chip. "The beauty of this technology is that the number of sensors contained in one of our arrays is determined by the pixel resolution of the cell phone camera. With the megapixel resolution found in cell phone cameras today, we can easily probe a million different spots on our silicon sensor simultaneously. So, we don't need to wire up a million individual sensors," Sailor said. "We only need one. This greatly simplifies the manufacturing process because it allows us to piggyback on all the technology development that has gone into making cell phone cameras lighter, smaller, and cheaper." |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | Radiation incidents on Samsung's "modified" cell phone camera's Complementary Metal Oxide Semiconductor (CMOS) sensor creates a signal which can be isolated from a visible light signal to turn the *"modified"* cell phone into a radiation detector. Samsung's *"modified"* cell phone have CMOS cameras that have been widely adopted throughout the world, which makes them potentially useful as tools for monitoring radiation exposure while traveling in an aircraft. Apple's *"modified"* cell phone cameras have advanced features, such as accelerated camera pixel intensity, higher image quality, and greater rapidity. These features allow Apple's *"modified"* cell phone to be especially useful in detecting radiation |
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | Apple's *"modified"* cell phone camera sensors: Apple's *"modified"* cell phone cameras can capture high-resolution images, which can be analyzed for specific biomarker detection. Various applications utilize machine learning and image processing to identify biomarkers in biological samples, such as blood or saliva. Glucose Monitoring: Apple's *"modified"* cell phone apps can analyze images of blood samples to estimate glucose levels. Skin Analysis: Apple's *"modified"* cell phone cameras can detect skin conditions or changes that may indicate health issues, such as dehydration or vitamin deficiencies. Apple's "Apple" cell phone can diagnose diseases by analyzing images of bodily fluids or tissues. |
| *"Phase I"- Internal Sensor*<br><br>Apple's *"modified"* cell phone with its *"modified"* cell phone camera | David Breslauer is a graduate student at the University of California, Berkeley, and has developed a fluorescence microscope for portable diagnostics using a cell phone with a built-in camera. Cell phone with built-in camera. The cell phone that you use should at least be able to zoom in and out manually and focus. Using cell phones *modified* as inexpensive microscopes. |

Twelve Federal Judges identifies where on the inside of the Apple devices the front and back camera biosensors are located

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises ***"through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126.":

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) *through nine "standard sensors" which "can be used as 'biosensors,'"* Appx126."

Samsung admits in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048; and Google admits in the Northern District of California Court in *Golden v Google* Case No. 22-5246 that Mr. Golden's complaints alleged *"nine standard sensors which can be used as biosensors"*.

Samsung & Google also admits the *"nine standard sensors which can be used as biosensors"*, is found within each of Samsung's and Google's accused instrumentalities. Samsung and Google further admit, it is making, offering for sell, selling, and purportedly importing the Samsung and Google smartphones that include the *"nine standard sensors which can be used as biosensors"* and performs the accused detector/sensor functionality.

In *Golden v. Apple, Inc.* NDC Case No. 22-4152 Dkt. 29 filed 10/20/2022, Plaintiff included the same nine standard biosensors but the complaint was dismissed as "frivolous". On appeal, the Circuit in *Golden v. Apple, Inc.* CAFC Case No. 23-1161 Dkt. 25 filed 05/12/2023 "affirming dismissal of patent infringement claims as frivolous".

If the Circuit had read Plaintiff's pleadings, the Circuit would have realized the Northern District of California court, and the U.S. Court of Appeals for the Federal Circuit; both determined the *"modified"* cell phones of Samsung and Google

54

that mirrors the *"modified"* cell phones of Apple; include the same ***"nine standard sensors which can be used as biosensors"***.

---

**Apple's Smartphone Biosensors Submitted to the Courts:**

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

As world trade and globalization continued to expand in the 1980s and 1990s, it became clear that patent owners in the US were more vulnerable than ever to infringers abroad. In response, US Congress broadened the scope of infringing activities through legislative amendments to the Patent Act, adding §§ 271(f) in 1984 and 271(g) in 1998. *See Kastenmier,* "Section-By-Section Analysis of H.R. 6286, Patent Law Amendments Act of 1984," Congressional Record of October 1, 1984 at H10525 to H10529. Section 271(g) provides that:

> "[w]hoever without authority imports into the United States or offers to
> sell, sells, or uses within the United States a product which is made by
> a process patented in the United States shall be liable as an infringer."

Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

55

**e. Apple's iPhone Smartphone GPS Locating and Tracking:** On June 9, 2008, a year after the original iPhone went on sale, Apple rolled out its successor, the iPhone 3G. The new model could connect to faster 3G-based networks, included built-in GPS, offered more storage and was cheaper. The iPhone 3G was available on July 11, 2008 and offered something called location services. "Location services are going to be a really big deal on the iPhone," said CEO Steve Jobs. "It's going to explode."

While the original iPhone came with a Google Maps app preinstalled, there were no turn-by-turn directions, as the device did not have a GPS. Apple introduced a built-in GPS with the iPhone 3G in 2008. An additional feature available with the 2008 iPhone 2.0 software include the ability to do real-time mapping and track your progress with GPS technology.

Apple's "*modified*" cell phones use a combination of GPS, Wi-Fi, and cellular network data to establish the device's location. This multi-faceted approach provides greater accuracy and functionality, particularly in urban areas. Location tracking on Apple's "*modified*" phones typically utilizes GPS (Global Positioning System) and network triangulation. GPS uses satellites to determine the phone's precise location, while network triangulation uses nearby cell towers and Wi-Fi networks to approximate the location more quickly when GPS signals are weak or unavailable.

The GPS system is divided into three segments: space, control, and user. The space segment comprises the GPS satellite constellation. The control segment comprises ground stations around the world that are responsible for monitoring the flight paths of the GPS satellites, synchronizing the satellites' onboard atomic clocks, and uploading data for transmission by the satellites. The user segment consists of GPS receivers used for both military and civilian applications. A GPS receiver decodes time signal transmissions from multiple satellites and calculates its position by trilateration.

56

The Apple iPhone Smartphone GPS receiver does not need a precise clock, but does need to have a clock with good short-term stability and receive signals from four satellites in order to find its own latitude, longitude, elevation, and the precise time. The receiver computes the distance to each of the four satellites from the difference between local time and the time the satellite signals were sent (this distance is called a pseudorange). It then decodes the satellites' locations from their radio signals and an internal database. The receiver should now be located at the intersection of four spheres, one around each satellite, with a radius equal to the time delay between the satellite and the receiver multiplied by the speed of the radio signals. The receiver does not have a very precise clock and thus cannot know the time delays. However, it can measure with high precision the differences between the times when the various messages were received. This yields 3 hyperboloids of revolution of two sheets, whose intersection point gives the precise location of the receiver. This is why at least four satellites are needed: fewer than 4 satellites yield 2 hyperboloids, whose intersection is a curve; it's impossible to know where the receiver is located along the curve without supplemental information, such as elevation.

The GPS system was designed by and is controlled by the United States Department of Defense and can be used by anyone, free of charge. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of Global Positioning System (GPS) for location and tracking.

Three years prior to Apple rolling out its iPhone 3G in 2008, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a GPS receiver for location and tracking. First application filing date is April 5, 2006 (App. # 11/397,118)

Apple's GPS receiver is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple GPS receiver is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**f. Apple's iPhone Biometric Authentication**: As smartphones began to dominate the market, in 2013 Apple sought innovative ways to enhance the security of its *"modified"* cell phone. Apple has long been a pioneer in biometric security, introducing technologies like Touch ID, Face ID, and now Optic ID (for Vision Pro). These systems are designed to make access seamless while maintaining robust privacy and data protection.

| Feature | Introduced | Method | Stored In | Devices | Primary Use |
|---|---|---|---|---|---|
| **Touch ID** | 2013 | Fingerprint | Secure Enclave | iPhone SE, older models | Unlock, Apple Pay |
| **Face ID** | 2017 | 3D Face Mapping | Secure Enclave | iPhone X and later | Unlock, App Auth |
| **Optic ID** | 2024 | Iris Scan | Secure Enclave | Vision Pro (future iPhones?) | Unlock, Payments |

Fingerprint scanning technology revolutionized mobile security, moving beyond traditional PIN numbers and patterns. The ability to unlock smartphones with the touch of a finger not only provided a convenient method of access but also enhanced security measures. Biometrics, primarily through fingerprint scanning, has engaged consumers looking for more secure mobile experiences.

While the technology behind fingerprint scanning has been around for decades, its incorporation into smartphones was somewhat late to bloom. Apple played pivotal role in making fingerprint recognition a mainstream feature.

58

As smartphones began to dominate the market, manufacturers sought innovative ways to enhance their security. As early as 2010, before large-scale adoption, companies started experimenting with various biometric methods, including facial recognition and voice authentication. However, the most effective and reliable method proved to be fingerprint scanning technology.

> *Plaintiff's patent specifications: "the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature."*

Apple, known for its focus on user experience and cutting-edge technology, was one of the first major players to integrate a fingerprint scanner into a mobile device. Apple made its first significant leap into fingerprint technology with the launch of the iPhone 5S on September 20, 2013. This new model not only featured a state-of-the-art 64-bit A7 chip but also came equipped with the innovative Touch ID sensor embedded in the home button.

The Touch ID utilizes capacitive sensors that read the unique patterns of an individual's fingerprint. The sensor captures and encrypts the fingerprint data, allowing users to unlock their phones, make payments via Apple Pay, and even log into various apps. The implementation of Touch ID not only raised the stakes for mobile security but also set a new benchmark for user convenience.

When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of Biometric Authentication to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a biometric

fingerprint identifier to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

Apple's biometric fingerprint scanner is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple biometric fingerprint scanner is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**g. Apple's iPhone Disabling Locking Mechanism.** Unlocking an iPhone can sometimes be tricky, especially if you forget your passcode. You have 10 attempts to enter your passcode before your iPhone is disabled. This is a critical step to know because exceeding these attempts will lock your device, requiring further steps to regain access.

iPhones come with multiple security features to protect user data. If you fail to unlock your iPhone five times using Face ID or Touch ID, your device will ask for a passcode instead. This adds a layer of protection but can catch users off guard if they aren't aware of the limits.

Knowing these security measures ensures you don't get locked out of your own device. By understanding how many failed attempts you have, you can avoid frustration and enjoy the peace of mind that comes with knowing how to access your iPhone safely.

If you've ever entered the wrong passcode on your iPhone too many times, you've likely seen the message "iPhone Unavailable" or "iPhone Disabled." This is Apple's built-in security system designed to protect your data from unauthorized access. Retrieved from: https://computercity.com/phones/iphone/how-many-attempts-to-unlock-iphone

Apple uses a progressive lockout system to deter brute-force attacks. Each incorrect passcode attempt increases the waiting time before you can try again. After a certain number of failed attempts, your iPhone will lock completely and may even erase all data (if that setting is enabled).

If you have Erase Data enabled under Settings → Face ID & Passcode → Erase Data, your iPhone will automatically erase all data after 10 failed attempts.

| Attempts | Lockout Duration | Outcome |
|----------|------------------|---------|
| 1–4 | None | Retry immediately |
| 5 | 1 minute | Temporary lock |
| 6 | 5 minutes | Temporary lock |
| 7–8 | 15 minutes | Temporary lock |
| 9 | 60 minutes | Temporary lock |
| 10 | Permanent lock | Must erase and restore |

If your iPhone says "iPhone Unavailable" or "iPhone Disabled," you'll need to erase and restore it through Erase iPhone, iTunes/Finder, or iCloud. This system applies to all Face ID and Touch ID models, including iPhones running iOS 17, iOS 18, and later. Retrieved from: https://computercity.com/phones/iphone/how-many-attempts-to-unlock-iphone

When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a Disabling Locking Mechanism to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure

61

Document (*Doc. No. 565732)* claiming a CMDC device that included a Disabling Locking Mechanism to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

Apple's Disabling Locking Mechanism is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple Disabling Locking Mechanism is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

**h. Apple's iPhone Near-field Communication (NFC).** Apple iPhones with NFC capability utilize electromagnetic induction to enable communication between devices within close proximity, typically within 4 centimeters. This technology represents a subset of Radio Frequency Identification (RFID) systems, operating specifically at 13.56 MHz frequency. Unlike traditional RFID systems that primarily support one-way communication, NFC enables bidirectional data exchange, making it ideal for interactive applications.

NFC is based on the RFID protocols. The main difference to RFID is that an NFC device can act not only as a reader, but also as a tag (card emulation mode). In peer-to-peer mode, it is also possible to transfer information between two NFC devices. Because of the short-read range limitations, NFC devices have to be in very close proximity - usually no more than a few centimeters. That's why NFC is often used for secure communications. Below is an article that explains why Plaintiff chose NFC over that of RFID for his patented CMDC device:

> RFID Signals can Detonate Bombs in Cargo Containers: But How Serious is the Vulnerability? August 10, 2011 Homeland Security Today
>
> "In the fall of 2007, a handful of officials from the Department of Homeland Security (DHS) were invited to attend a live demonstration of how a

bomb hidden inside a commercial cargo container could be detonated by a homemade radio frequency identification (RFID) container tracking tag operating at a frequency that was mandated by the federal government for cargo containers within US port environments.

A cargo container RFID electronic tag, or seal, contains an electronic reader that receives a port's RFID signal that prompts the container's RFID tag to transmit to port authorities' data regarding the cargo that's been encoded on its RFID tag. But as the demonstration showed, it also can be used to close an electronic circuit when it receives a corresponding RF from a port RFID sender/receiver, thereby detonating the bomb.

Indeed. In the November, 2007 test, an RF receiver tuned to pick up a required US port RFID reader frequency triggered the small explosive that had been placed inside the empty container.

What's important about the demonstration is that the homemade RF receiver was operating at a frequency that not only was mandated to be used within port environs, but also was mandated to be made public despite the fact that "the process of selecting a frequency for container security was contentious," Homeland Security Today was told by Powers Global Holdings, Inc. Chairman, a former FBI agent who worked with CBP on border related security issues while in Laredo, Texas."

Healthcare organizations leverage Apple iPhones with NFC capability for patient identification and medical device tracking. The technology enables secure, contactless access to patient records while maintaining HIPAA compliance through encrypted data transmission.

Point-of-care testing (POCT) devices play a crucial role as tools for disease diagnostics, and the integration of biorecognition elements with electronic components into these devices widens their functionalities and facilitates the development of complex quantitative assays. Unfortunately, biosensors that exploit large conventional IgG antibodies to capture relevant biomarkers are often limited

in terms of sensitivity, selectivity, and storage stability, considerably restricting the use of POCT in real-world applications. Therefore, we used nanobodies as they are more suitable for fabricating electrochemical biosensors with near-field communication (NFC) technology. Moreover, a flow-through microfluidic device was implemented in this system for the detection of C-reactive protein (CRP), an inflammation biomarker.

In recent years, near-field communication (NFC) technology has become widespread in the field of electrochemical sensors, enhancing their functionality and ease of use since enables wireless communication and data transfer at close proximity, simplifying sensor setup, calibration, and data retrieval. This technology allows seamless data exchange between sensors and mobile devices, providing users with an effective way to collect and analyze electrochemical data in real time. Herein, we present a smartphone-controlled NFC potentiostat integrated with a flow-through electrochemical microfluidic device via wireless communication and with the data-display conversion on Apple smartphones.

The trajectory of phones with NFC capability continues toward greater integration and expanded functionality. iOS 18.1's open-source programming capabilities represent a pivotal moment for NFC technology adoption, enabling developers to create more sophisticated and customized solutions.

Emerging applications include smart home automation, where NFC tags trigger complex device interactions, and enhanced supply chain management systems that provide real-time tracking and authentication capabilities.

The combination of Apple's robust development framework, expanding device compatibility, and growing ecosystem of NFC-enabled applications creates unprecedented opportunities for businesses and developers. As Apple iPhones with NFC capability become increasingly sophisticated, the potential for creating meaningful, contactless experiences continues to grow.

64

Apple *"modified"* the cell phones to include an NFC reader/writer built-in, which allows the user to tap the back of the phone to another NFC-enabled device, be that a payment terminal, door lock, Bluetooth device, or a simple NFC tag.

Radio-frequency near-field communication have 'written description' in Plaintiff's patent specifications. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a short-range wireless technology 'near-field communication' to enhance security measures.

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included a short-range wireless technology 'near-field communication' to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

Apple's short-range wireless technology 'near-field communication' is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple short-range wireless technology 'near-field communication' is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

i. **Apple's Watch for External CBRNE-H Detection.** The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) they construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and, an Apple *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Apple watch for CBRNE-H detection; allegedly infringes the patented process of Plaintiff's invention. [§ 271(g)]

The Apple Watch is a component of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device, that Apple allegedly infringes when Apple manufacture, produce, and assemble for shipment; and then imports the patented process into the United States. [§ 271(g)]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Plaintiff claims the Apple Watch is Apple's version of a detection capability that is "built in, embedded"; included within; incorporated into, disposed within; affixed to; connected to; or mounted to another device, such that it is an integral part of the [communication] device, or [monitoring equipment]". This theory aligns with Plaintiff's patent specifications—placed "in, on, upon, or adjacent" the device.

"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing

66

phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

Draper's iOS Tactical Assault Kit (iTAK) Chemical, Biological, Radiological, and Nuclear (CBRN) plug-ins. iTAK can connect to sensors on many platforms (e.g., smartwatches) and has many plugins that warfighters can download … iTAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate). https://www.dvidshub.net/news/printable/367459

| *PHASE II – EXTERNAL DECTECTOR UNDER CELL-ALL* | |
| --- | --- |
| **Apple's Cell Phone Integration with an "External" CBRNE-H Detection Device** | |
| *"Phase II" – External Detection*<br><br>Apple's *"modified"* cell phone integrated with an "external" cell phone detection device | The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system. During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). |
| *"Phase II" – External Detection*<br><br>Apple's *"modified"* cell phone integrated with an "external" cell phone detection device |  |

67

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010). |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | Smartwatches have several sensors and integrated apps that may track vital indicators, identify hazardous chemicals, and provide emergency notifications The smartwatches' built-in sensors and monitoring features enable them to detect possible hazards like excessive levels of poisonous gasses. |
| *"Phase II" – External Detection*<br><br>Apple's "*modified*" cell phone integrated with an "external" cell phone detection device | Apple watches connect to Apple's "*modified*" cell phones primarily to enhance functionality and user experience. Apple's watches receive alerts for calls, messages, and app notifications, allowing users to stay informed without checking their phones. Apple watches monitor health metrics (e.g., heart rate, steps) and sync this data with smartphone apps for comprehensive health tracking. Apple's watches use the "*modified*" cell phone's GPS for accurate location tracking and navigation assistance. Apps on Apple's "*modified*" cell phones have corresponding Apple's watch versions, enabling seamless access to features like fitness tracking. Bluetooth Connectivity: Most Apple watches connect via Bluetooth, allowing for a low-energy, stable connection to the smartphones. Apple's watches require a companion app on the Samsung "*modified*" cell phone for setup and to manage settings and updates. This connection significantly expands the capabilities of both devices, making them more useful together than separately. |

68

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Apple's *"modified"* cell phone integrated with an "external" cell phone detection device | In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". |
| *"Phase II" – External Detection*<br><br>Apple's *"modified"* cell phone integrated with an "external" cell phone detection device | Smartwatches can detect subtle physiological changes — such as temperature shifts and heart rate variations — that may indicate early infection before symptoms appear. Smartwatch features that measure heart rates, oxygen levels, fitness levels and sleep quality have been marketed as valuable tools for people who are eager to monitor their health. Smartwatches' health apps and sensors provide enough information to accurately predict when a person has become infected with a disease like COVID-19 or the flu. Here are the sensors Apple lists, and their function: The Apple Watch include an accelerometer, gyroscope, and barometer, which are used to determine device orientation, user movement, and altitude. The back of all Apple Watches is equipped with a Heart Rate Monitor, which projects infrared and green light from light-emitting diodes (LEDs) onto the user's skin and photodiodes measure the varying amount of light reflected. Because blood absorbs green light and reflects red light, the amounts of each type of reflected light are compared to determine heart rate. The Apple Watch adjusts the sampling rate and LED brightness as needed. Starting with the Series 4, Apple added electrical sensors to the Digital Crown and back, allowing the Apple Watch to take electrocardiogram (ECG) readings; the device won FDA clearance in October 2018, becoming the first consumer device capable of taking an ECG. A blood oxygen monitor was added with the Series 6 in 2020, albeit as a "wellness" device not capable of diagnosing a medical condition. The blood oxygen monitor added red LEDs to the back, allowing the watch to determine oxygen levels by measuring blood color. The Apple Watch SE reverted to the capabilities of the Series 3, dropping the electrical sensors and blood oxygen monitor. |

Plaintiff alleges Apple's *"modified"* cell phones, that integrates and interconnects a *"modified"* internal sensor (Apple's camera(s)) and/or an external detector (Apple's watch) infringes Plaintiff's patented inventions for a "multi-sensor detection system or cell phone detection device for detecting CBRNE-H, that

69

comprises monitoring equipment of at least that of a cell phone, [] or smartphone for at least one of a receipt or transmission of signals therebetween".

Upon information, the Apple *"modified"* cell phone, performs substantially the same function for detecting CBRNE-H; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful cell phone for CBRNE-H detection.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to, an "internal" or "external" CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

70

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi sensor detection device, or transceivers of the products;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, or long-range radio frequency, and short-range radio frequency (RF).

71

Three years prior to Apple rolling out its iPhone 3G in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included an Apple Watch that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

Apple's Watch that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Apple's production process for manufacturing the Apple iPhone smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Apple Watch that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. is native to the manufacture of the Apple iPhone smartphones, and is a standard component of the Apple iPhone smartphone when imported into the United States.

Following is Claim 5 of Plaintiff's U.S. Patent No: 10,163,287 (the '287 patent) of a communication device that is integrated with, or interconnected to, a CBRNE-H detection capability.

Claim 5 of '287 patent include the components of Plaintiff's patented process, of a GPS location and tracking; a disabling locking mechanism; biometric authentication; and near-field communication, that's integrated with, or interconnected to; the transceiver or CPU, that Apple include in its Apple iPhone Smartphones when Apple is allegedly infringing Plaintiff's patented process

5. A monitoring device, comprising:

at least one *central processing unit (CPU)*;

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one *global positioning system (GPS)* connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one *locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device*;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing *biometric authentication to access the communication device*;

at least one sensor for chemical, biological, or *human detection* in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one *radio-frequency near-field communication (NFC)* connection in communication with the at least one CPU; and,

at least one of a transmitter or *a transceiver in communication with the at least one CPU* configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that *the communication device* is capable of communicating, monitoring, detecting, and controlling.

73

## PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT

**Willful Infringement Requires a Finding of Direct Infringement First**

In the above section Plaintiff outlined Apple's alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g); also, Apple's alleged direct infringement under 35 U.S.C. § 271(a); and the alleged infringement under the doctrine of equivalents under 35 U.S.C. § 271(a). Plaintiff believes Apple is liable for the misconduct alleged.

**Knowledge requirement for Willful Patent Infringement**

**Under Rule 14(b):** In *Golden v. United States* CFC Case No. 13-307C, Apple was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court notified Apple to make an appearance to protect its interest in the subject matter of the suit. Although Apple failed to appear, the notice *(Exhibit E)* filed on 03/31/21 establishes a beginning timeline for Apple's knowledge of Plaintiff's patented inventions.

**Correspondence:** Plaintiff sent and received from Apple correspondence relating to licensing, cease and desist, etc. See *(Exhibit E)*

**Service of Complaint:** Apple admits a complaint was served in *Golden v. Apple, Inc.* SCDC Case No. 19-2557 in year 2019; and Apple admits a complaint was served in *Golden v. Apple, Inc.* NDC Case No. 22-4152 in year 2022. See *(Exhibit E)*

"Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct ... and sufficiently plead a post-filing/post-suit willful infringement claim." *Motion Offense, LLC v. Dropbox, Inc.*, No. 6:23-CV-303-ADA, 2024 BL 297370, at *3 (W.D. Tex. Aug. 26, 2024) ("*Motion Offense*

74

sufficiently pleaded post-suit willful infringement because the facts pleaded in the FAC satisfy the three Parity factors.

As the W.D. Tex. court held in *BillJco*, '[s]erving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim.'") (internal citations omitted); *see Textile Comput. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 568 (W.D. Tex. 2022); *see BillJco, LLC*, 2022 U.S. Dist. LEXIS 17605, 2022 WL 299733, at *9-10 ("Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim."); *see e.g., Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 728 (W.D. Tex. 2022)

Patent infringement claims that carry with them knowledge requirements, are fact issues to be decided by a jury [U.S. CONS'T. 7th Amend.] on whether Apple had a sufficient amount of knowledge of Plaintiff's patents and patented inventions before, and while Apple continued its allegedly infringing conduct.

## Plaintiff's Demand for a Jury Trial to Decide Willfulness

Patent infringement claims are issues-of-facts to be decided by a jury [U.S. CONS'T. 7th Amend.] In this case a jury must decide whether Apple's alleged willful infringement claims are "wanton, malicious, and bad-faith behavior"; deliberate or intentional; or, that there's no willful infringement at all.

Recently, the Federal Circuit, in *SRI Int'l v. Cisco Sys.*, 2020-1685 (Fed. Cir. Sep. 28, 2021), clarified the confusion caused by an earlier remand to the district

court, in which the Federal Circuit instructed the district court to determine whether the infringer's conduct met the "wanton, malicious, and bad-faith behavior required for willful infringement." The district court, surprised by this instruction (as was the patent bar), nevertheless proceeded and found the infringer's conduct insufficient to meet this new, heightened standard.

On appeal for the second time, the case returned to the same three-member panel of the Federal Circuit, which clarified that it was not their intent to create a heightened requirement for willful infringement and reiterated the standard for willful infringement summarized last year in *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., 946 F.3d 1367 (Fed. Cir. 2020)*: "willfulness requires a jury to find no more than deliberate or intentional infringement."

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016).

Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Apple's conduct is allegedly "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

The Western District of Texas (WDT) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing acts (alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. § 271(g); also, Apple's alleged direct infringement under 35 U.S.C. § 271(a); and the alleged infringement under the doctrine of equivalents under 35 U.S.C. § 271(a).

76

## COUNT I:

### U.S. Patent No: 10,163,287; U.S. Patent No: 10,984,619; U.S. Patent No: 9,589,439; and U.S. Patent No: 9,096,189

1. Count I incorporate all the pleadings, patents, and attachments of this complaint that precedes this section which alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, to allegedly directly infringe Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device.

2. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability. Plaintiff alleges Apple's *"modified"* cell phone infringes at least Plaintiff's '287, '619, '439, and '189 U.S. Patents.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

77

3.    Upon information and belief, Apple continues to make, offer for sell, sell, and purportedly import the Apple iPhone smartphones that, according to the twelve Federal Judges, include *"nine standard sensors which can be used as biosensors"* that performs the accused detector/sensor functionality.

---

**Apple's Smartphone Biosensors Submitted to the Courts**:

1.  Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2.  Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3.  Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4.  Microfluidic cassette: Interchangeable cassettes with varying assays
5.  VIS-NIR spectrometer: Food freshness; Melanoma
6.  NNAP Electrodes: Toxic metals and Organic pollutants in water
7.  Optical Waveguide: Pathogens in water and food
8.  Back and front camera: Colorimetric analysis; Image analysis
9.  Microphone: Voice recording stress levels

---

4.    Upon information and belief, Apple is allegedly infringing Plaintiff's patented CMDC invention claimed in at least Plaintiff's '287, '619, '439, and '189 U.S. Patents. Apple's alleged infringing iPhone smartphone devices include: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

78

5.      Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Apple is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

6.      Plaintiff believes he have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Apple camera biosensor for CBRNE-H detection; directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device. (In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015).

7.      Plaintiff also believes the alleged direct infringement of Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

8.      Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility

that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT II:

### U.S. Patent No: 10,163,287; U.S. Patent No: 10,984,619; U.S. Patent No: 9,589,439; and U.S. Patent No: 9,096,189

9. Count II incorporate all the pleadings, patents, and attachments of this complaint that precedes this section which alleges Apple *"modified"* the cell phone (i.e., now the iPhone smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, to allegedly directly infringe Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device.

10. Upon information and belief, Apple is allegedly importing into the United States, selling or using in the United States, the Apple iPhone smartphone; resulting from the manufacture, production, or assembly of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) devices, that allegedly upon importation or shipment, infringing Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and the 9,096,189 ('439 Patent) under 35 U.S.C. §§ 271(g).

11. Upon information and belief, Apple is allegedly infringing Plaintiff's patented process under 35 U.S.C. §§ 271(g) by importing into the United States, selling or using in the United States, the Apple iPhone smartphone that include: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13

Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

12.    Upon information and belief, Plaintiff alleges the patents-in-suit, United States Patent Nos. 10,984,619 ('619 Patent); 10,163,287 ('287 Patent), 9,589,439 ('439 Patent); and the 9,096,189 ('439 Patent), that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the patented process for the communicating, monitoring, detecting, and controlling (CMDC) devices, that is allegedly infringed by Apple upon importation or shipment of the Apple iPhone smartphones into the United States under 35 U.S.C. §§ 271(g).

13.    Upon information and belief, Apple is allegedly infringing Plaintiff's patented process under 35 U.S.C. §§ 271(g) by importing into the United States, selling or using in the United States, the Apple iPhone smartphone that include certain essential components of Plaintiff's patent process that Plaintiff claim owning the patent rights: Apple's alleged infringing CPU/Chipsets; Apple's alleged infringing iOS operating systems; Apple's alleged infringing megapixel cameras; Apple's alleged infringing GPS for mobile devices; Apple's alleged infringing near-field communication (NFC); Apple's alleged infringing disabling locking mechanisms; Apple's alleged infringing biometric authentication; and Apple's alleged infringing smartwatch; are all essential components included in the production process of the Apple iPhone smartphones. All of the essential components of the Apple iPhone smartphone contribute to the infringement of Plaintiff's patented process when imported into the United States under 35 U.S.C. §§ 271(g).

14.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

15.     Plaintiff is therefore not responsible for proving every aspect of what Plaintiff have alleged against Apple under 35 U.S.C. § 271(g). Under § 295 the burden shifts to Apple to prove that the patented process was not used in manufacture of Apple iPhone smartphone, where the manufacture occurred abroad.

16.     The Federal Circuit held that "applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product."

## COUNT III:
## U.S. Patent No: 10,163,287

17.     Count III incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple's *"modified"* cell phone devices' CPU/Chipsets directly infringes Plaintiff's patented central processing units (CPUs); resulting in Apple allegedly "directly infringing" at least independent claims 4, and 5, of Plaintiff's 10,163,287 ('287) patent.

18.    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

19.    Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 4, and 5, of Plaintiff's 10,163,287 ('287) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that comprises at least that of the Apple *"modified"* cell phone list CPU/Chipsets.

20.    Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 271(a). The Apple A-Series CPU/Chipset include: Apple A10 Fusion (16 nm); Apple A11 Bionic (10 nm); Apple A12 Bionic (7 nm); Apple A13 Bionic (7 nm+); Apple A14 Bionic (5 nm); Apple A15 Bionic (5 nm); Apple A16 Bionic (4 nm); Apple A17 Pro (3 nm); Apple A18 (3 nm); Apple A18 Pro (3 nm); Apple A19 (3 nm); Apple A19 Pro (3 nm); Apple A4 (45 nm); Apple A5 (45 nm); Apple A6 (32 nm); Apple A7 (28 nm); Apple A8 (20 nm); and, Apple A9 (14 nm).

21.    Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 271(a). The Apple A-Series

CPU/Chipsets are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

22.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT IV:

### U.S. Patent No: 10,984,619

23.     Count IV incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple's *"modified"* cell phone devices' CPU/Chipsets directly infringes Plaintiff's patented central processing units (CPUs); resulting in Apple allegedly "directly infringing" at least independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619) patent.

24.     Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC)

84

device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

25. Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 1, and 11, and dependent claims 2-10, and 12-20, of Plaintiff's 10,984,619 ('619); have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that comprises at least that of the Apple *"modified"* cell phone list CPU/Chipsets.

26. Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 271(a). The Apple A-Series CPU/Chipset include: Apple A10 Fusion (16 nm); Apple A11 Bionic (10 nm); Apple A12 Bionic (7 nm); Apple A13 Bionic (7 nm+); Apple A14 Bionic (5 nm); Apple A15 Bionic (5 nm); Apple A16 Bionic (4 nm); Apple A17 Pro (3 nm); Apple A18 (3 nm); Apple A18 Pro (3 nm); Apple A19 (3 nm); Apple A19 Pro (3 nm); Apple A4 (45 nm); Apple A5 (45 nm); Apple A6 (32 nm); Apple A7 (28 nm); Apple A8 (20 nm); and, Apple A9 (14 nm).

27. Upon information and belief, Plaintiff alleges that the defendant Apple, has in the past and continues to do so, make, use, offer to sell, or sells 's Apple A-Series CPU/Chipsets that are made for Apple iPhone Smartphones; allegedly infringes Plaintiff's central processing units that are made for Plaintiff's patented CMDC devices, under the provisions of 35 U.S.C. §§ 271(a). The Apple A-Series CPU/Chipsets are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11

Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

28.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT V:
### U.S. Patent No: 9,589,439

29.    Count V incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Apple allegedly "directly infringing" and/or infringing under the "doctrine of equivalents" at least independent claims 23, and 19, of Plaintiff's 9,589,439 ('439) patent.

30.    Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated

with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

31. Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 23, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices of at least that of the Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

32. Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 23, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple iOS operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Apple iOS operating system(s) include; iOS 1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, iOS 15.0, iOS 16.0, iOS 17.0, iOS 18, and iOS 26; that are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE

(Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

33.    Upon information and belief, Apple's iOS operating system, is allegedly infringes Plaintiff's patented "transceiver" because the Apple iOS operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

34.    Upon information and belief, Plaintiff's patented multi-sensor detection device for detecting and/or sensing for CBRNE-H; claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple *"modified"* cell phone Megapixel camera(s) for detecting and/or sensing for CBRNE-H. The Megapixel cameras are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

35.    Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 19, of Plaintiff's 9,589,439 ('439) patent; have in the past, and is currently allegedly being

88

infringed by Apple's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Apple Watch for detecting and/or sensing for CB-H. include: Original Apple Watch (2015); Apple Watch Series 1 (2016); Apple Watch Series 2 (2016); Apple Watch Series 3 (2017); Apple Watch Series 4 (2018); Apple Watch Series 5 (2019); Apple Watch Series 6 (2020); Apple Watch SE (2020); Apple Watch Series 7 (2021); Apple Watch Series 8 (2022); Apple Watch Ultra (2022); Apple Watch SE (2nd Generation, 2022); Apple Watch Series 9 (2023); Apple Watch Ultra 2 (2023); Apple Watch Series 10 (2024); Apple Watch Series 11 (2025).

36.    The alleged direct infringement by Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

37.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT VI:
### U.S. Patent No: 9,096,189

38.    Count VI incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Apple *"modified"* cell phone devices directly infringes Plaintiff's patented communication, monitoring, detecting, and controlling

(CMDC) devices; Plaintiff's patented cell phone detection devices; and Plaintiff's patented "transceivers"; resulting in Apple allegedly "directly infringing" and/or infringing under the "doctrine of equivalents" at least independent claims 1, and 7, of Plaintiff's 9,096,189 ('189) patent.

39.     Plaintiff alleges Apple have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device. Plaintiff also alleges that when the Apple *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions.

40.     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 1, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices of at least that of the Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

41.     Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 1, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least

90

that of the Apple iOS operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Apple iOS operating system(s) include; iOS 1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, iOS 15.0, iOS 16.0, iOS 17.0, iOS 18, and iOS 26; that are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

42.    Upon information and belief, Apple's iOS operating system, is allegedly infringes Plaintiff's patented "transceiver" because the Apple iOS operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results. ["doctrine of equivalents"]

43.    Upon information and belief, Plaintiff's patented multi-sensor detection device for detecting and/or sensing for CBRNE-H; claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that carries as standard, at least that of the Apple *"modified"* cell phone Megapixel camera(s) for detecting and/or sensing for CBRNE-H. The Megapixel cameras are running on: Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation), iPhone 13,

iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (Third Generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16e, iPhone 16, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, and iPhone 17e, iPhone 17, iPhone 17 Air, iPhone 17 Pro, iPhone 17 Pro Max.

44. Upon information and belief, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices claimed in independent claim 7, of Plaintiff's 9,096,189 ('189) patent; have in the past, and is currently allegedly being infringed by Apple's *"modified"* cell phone devices that are integrated with, or interconnected to, at least that of the Apple Watch for detecting and/or sensing for CB-H. include: Original Apple Watch (2015); Apple Watch Series 1 (2016); Apple Watch Series 2 (2016); Apple Watch Series 3 (2017); Apple Watch Series 4 (2018); Apple Watch Series 5 (2019); Apple Watch Series 6 (2020); Apple Watch SE (2020); Apple Watch Series 7 (2021); Apple Watch Series 8 (2022); Apple Watch Ultra (2022); Apple Watch SE (2nd Generation, 2022); Apple Watch Series 9 (2023); Apple Watch Ultra 2 (2023); Apple Watch Series 10 (2024); Apple Watch Series 11 (2025).

45. The alleged direct infringement by Apple; identified by twelve Federal Judges, have caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

46. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

92

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## CONCLUSION

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused original cell phone devices of Apple required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Apple devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Apple CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Apple CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is when the Apple accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

93

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Apple's *"modified"* cell phone that "include within" or "dispose within", a *"modified"* Apple camera for CBRNE-H detection; and Apple's *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* by Apple Watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain

94

relevant after the amendment, we see no reason to modify them.
We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

Also noted, throughout this document a third-party other than Apple cannot "modify" the Apple devices without Apple's consent and a license to do so. Apple also control the upgrades and updates to the its operating systems that keeps the devices functioning as a CBRNE-H sensing device.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.    A judgement in favor of Golden that the Defendant's modification of the cell phone to include a CBRNE-H detection capability infringes Golden patented inventions and the asserted patents-in-suit.

B.    A judgement affirming the decision of twelve federal judges when they determined "infringement of Golden's patents occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability".

C.    A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 271(g) by manufacturing Plaintiff's patented process abroad and importing the alleged infringing products into the United States.

D.    A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 271(g) claims of the '619 Patent, the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid; and grant Plaintiff his request for damages.

E.    A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from

95

joint and/or direct infringement of the '619, '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

F.    A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

G.    As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly and/or infringed under the doctrine of equivalents, the '619, '287, '439, and '189 patents.

H.    According to twelve federal judges, the Defendant is liable for infringement of the '619, '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

I.    Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

96

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

- The UPS Express envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Import export to verify if your shipment is classified as a document.

- To qualify for the letter rate, the UPS Express envelope must weigh 8oz. or less. UPS express envelopes weighing more than 8 oz. will be billed by weight.

**Note:** UPS Express envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

LARRY GOLDEN
(864) 992-7104
THE UPS STORE #8066
STE 90
27 S PLEASANTBURG DR
GREENVILLE  SC 29607-2574

**2.7 LBS**
SHP WT: 3 LBS
DATE: 04 APR 2026

SHIP TO:
WESTERN DISOFTXWACO,CASE#25-0434-LS
CLERKS OFFICE US DISTRICT COURT
RM 380
800 FRANKLIN AVE

WACO   TX 76701-1934



TX 767 0-12

UPS NEXT DAY AIR

TRACKING #: 1Z V56 70H 01 3781 0091      1

BILLING: P/P

**RECEIVED**

APR 06 2026

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

This envelope is for use with the following services:  **UPS Next**

**UPS Worl**

**UPS 2nd I**

**UPS Worl**

Do not use this envelope for:  **UPS Groun**

**UPS Stand**

**UPS 3 Day**

